Filed 7/20/23

CERTIFIED FOR PUBLICATION
COURT OF APPEAL, FOURTH APPELLATE DISTRICT
DIVISION ONE
STATE OF CALIFORNIA

| | |
|---|---|
| DALIA ROJAS,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>HSBC CARD SERVICES INC. et al.,<br><br>    Defendants and Appellants. | D077931<br><br><br>(Super. Ct. No. 37-2014-00023795-CU-MC-NC) |
| DALIA ROJAS,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>HSBC CARD SERVICES INC. et al.,<br><br>    Defendants and Respondents. | D078511<br><br><br>(Super. Ct. No. 37-2014-00023795-CU-MC-NC) |

CONSOLIDATED APPEALS from a judgment and postjudgment order of the Superior Court of San Diego County, Jacqueline M. Stern, Judge, and Cynthia A. Freeland, Judge. Affirmed.

Law Offices of Deborah L. Raymond and Deborah L. Raymond, for Plaintiff and Appellant.

Stroock & Stroock & Lavan, Julia B. Strickland, John R. Loftus, David W. Moon and Christine E. Ellice for Defendants, Cross-appellants and Respondents.

This is the second round of appeals arising from Dalia Rojas's lawsuit against HSBC Card Services, Inc. (HSBC Card Services) and HSBC Technology & Services (USA) Inc. (HSBC Tech Services; together, HSBC) for violations of the California Invasion of Privacy Act (Privacy Act; Pen. Code, § 630, et seq.)[1] Rojas received hundreds of personal calls from her daughter Alejandra, an employee at an HSBC call center, which were recorded by HSBC's full-time recording system. Rojas alleges HSBC intentionally recorded confidential calls without her consent, in violation of section 632, subdivision (a). She also alleges HSBC intentionally recorded calls to her cellular and cordless phones without her consent, in violation of section 632.7, subdivision (a).

The trial court granted summary judgment to HSBC, and Rojas appealed. (*Rojas v. HSBC Card Services Inc.* (2018) 20 Cal.App.5th 427, 431 (*Rojas I*).) We reversed, concluding HSBC had not met its initial burden to show there was no triable issue of material fact on intent. (*Id.*, at pp. 429, 432.)

On remand, HSBC made a Code of Civil Procedure section 998 offer, which Rojas did not accept. The case proceeded to a bench trial, where HSBC relied, in part, on workplace policies that purportedly barred call center

---

[1]    Further statutory references are to the Penal Code unless noted. One such exception is "section 998," which refers to the Code of Civil Procedure.

agents from making personal calls at their desks to show it did not intend to record the calls. HSBC also presented evidence that Rojas received recording disclosures in connection with her HSBC credit card, through the cardmember agreement and her monthly payment calls to HSBC. Rojas elicited testimony that HSBC managers knew personal calls were being made by call center agents, including by Alejandra, and denied she consented to recording. The trial court entered judgment for HSBC. Pertinent here, the court found Rojas did not prove HSBC's intent to record. The court also found Rojas impliedly consented to being recorded, and did not prove lack of consent. HSBC sought costs, including pursuant to its section 998 offer, which Rojas moved to strike or tax. The court ruled the section 998 offer was valid and denied Rojas's motion.

Rojas appeals from the judgment, contending the trial court made several errors in determining she did not prove her Privacy Act claims and that the evidence did not support its findings. Rojas also appeals from the denial of her motion to strike or tax costs, arguing the section 998 offer was invalid and the court erred in awarding HSBC expert costs, failing to consider her limited resources in awarding those costs, and awarding costs for unused trial exhibits.[2]

We conclude the trial court applied correct legal standards in assessing lack of consent and substantial evidence supports its finding that Rojas impliedly consented to being recorded. We are compelled to affirm the

_____

[2]    On our own motion, we consolidate the appeals for purposes of decision. (*See Hong Sang Market, Inc. v. Peng* (2018) 20 Cal.App.5th 474, 481, fn. 1.) HSBC also filed a protective cross-appeal from the judgment regarding a summary adjudication ruling that Rojas could seek $5000 per violation, rather than per action. Because we affirm the judgment, we do not reach the cross-appeal.

3

judgment under these circumstances. Although we determine the record does not support the court's finding that HSBC did not intend to record the calls between Rojas and her daughter, that determination does not require reversal. What it underscores, however, is that a business's full-time recording of calls without adequate notice creates conditions ripe for potential liability under the Privacy Act, and workplace policies prohibiting personal calls may not mitigate that risk. On the costs order, we conclude the court properly determined the section 998 offer was valid, and did not abuse its discretion in awarding costs. The judgment and postjudgment order are affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

I.      *Underlying Events*[3]

A.      *HSBC's Salinas Facility*

During the relevant time period (March 2009 to May 2012), HSBC's business included issuing credit cards. HSBC Tech Services provided telephone recording services to HSBC Card Services.

Rojas's daughter, Alejandra, worked at the HSBC Card Services call center in Salinas, California ("the Salinas facility"). At this facility, all calls to and from call center agent's desk phones (i.e., customer-facing phones) were recorded. There was no way for agents to disable recording on their desk telephones. There was an automated disclosure for inbound calls, which stated "This call is being recorded for quality purposes," but no automatic outbound recording disclosure.

---

[3]     This summary is based on the trial record, and includes facts that became available after we reversed summary judgment in *Rojas I*. The record as of summary judgment is reflected there.

James Ivey had managerial responsibilities for the fraud and disputes departments in the Salinas facility. He oversaw department managers, who oversaw unit managers, who supervised the agents. Alma Escamilla was a unit manager, and then department manager in dispute processing. Leticia Ramirez was a senior unit manager in dispute processing, and then a quality manager.

B.  *HSBC Workplace Policies Applicable To The Salinas Facility*

The Salinas facility was subject to two sets of written policies: "Inside HR," and "Scout." Inside HR housed HSBC's global, companywide human resources policies. These included an "Electronic Monitoring and Device Use" policy, which stated HBSC "periodically monitors and/or records certain employee telephone conversations." The policy also stated employees "may use" telephones "for occasional non-work purposes," and explained, "[P]ersonal calls may be recorded, but should never be monitored; if you identify a personal call in the course of monitoring an employee, the monitoring should be discontinued immediately."

Scout was a "database of policies and procedures for all operational units," and had "more relevant information . . . specific to . . . operational areas . . . within the call centers." These policies included a "Call Avoidance" policy, which barred employees from making outbound calls to avoid taking inbound ones; a "Recording Disclosure to Third Parties" policy, which applied when a non-cardmember was on the line; and a "Call Cardmember Procedure," for calls to resolve disputes, which said to "[u]se the following suggested dialogue . . . [¶] [T]his call may be recorded and monitored for quality assurance purposes" and required a recording disclosure to third parties.

As we discuss *post*, HSBC also had a practice of sending a cardmember agreement to all cardholders, which contained a recording disclosure.

### C.   *HSBC Records Calls To Rojas*

HSBC recorded over 300 calls from Alejandra to Rojas.[4] Some calls were made to Rojas's cell phone; others were made to her home telephone line, which had both corded and cordless handsets; and still others were to her work telephone at J.C. Penney.

## II.   *Litigation*

### A.   *Lawsuit, Summary Judgment, And First Appeal*

Rojas sued HSBC for Privacy Act violations in 2014. In her operative first amended complaint, she alleged HSBC "willfully employ[ed] . . . recording . . . equipment" to record her communications "without [her] knowledge or consent . . . ." She asserted one cause of action under section 632 (which covers "confidential communication[s]"), and a second cause of action under section 632.7 (which applies to cellular or cordless phones, and does not require confidentiality). (§ 632, subds. (a), (c); § 632.7, subd. (a).)[5]

HSBC moved for summary judgment in 2016. The trial court granted summary judgment, Rojas appealed, and we reversed. (*Rojas I, supra,* 20 Cal.App.5th at p. 431.) We discuss *Rojas I* in addressing intent, *post*. Here, it suffices to say we held HSBC did not establish as a matter of law that it

---

[4]   HSBC produced 317 recordings in discovery, but the parties stipulated there were 302 non-duplicative recordings. All but one was from Alejandra, and the other was from an acquaintance of Rojas.

[5]   The operative complaint involved additional parties, who are not at issue here. HSBC also filed a cross-complaint for equitable indemnity and contribution against Alejandra, which also is not at issue.

lacked the intent to record, and that a reasonable trier of fact could find it did have such an intent. (*Id.* at p. 435.) The remittitur issued in 2019.

B. *Trial*

The case proceeded to an eight-day bench trial in 2020. One hundred and nine call recordings were played at trial, and several witnesses testified.[6]

Richard Marcy, HSBC Tech Services' head of telecommunications for the United States and Latin America, confirmed the Salinas facility used an automatic recording disclosure on inbound calls, and testified they used employee disclosures for outbound calls. He acknowledged they were able to include an automatic disclosure or beep on outbound calls, but HSBC Card Services decided not to do so. HSBC expert witness Darlene Geller-Stoff testified this was consistent with best practices, and explained that "launching the call with an automated message very, very significantly decreases the chance that the call will be answered . . . ."

Peter Garcia, Jr., a senior branch manager who had worked at call centers including the Salinas facility, testified HSBC trained call center agents to make recording disclosures on all outbound calls. Ivey, who led fraud and disputes at the Salinas facility, explained call disclosures were a "critical" training item, and "one of the things that [they] paid the most attention to." He acknowledged it was a "risk" the "agent won't make the proper disclosure to a merchant . . . ." Marcy similarly testified outbound calls were a concern, "because they knew that not all agents were doing [the

---

[6] We focus here on HSBC's recording disclosure practices and asserted ban on personal calls; Rojas and her calls from Alejandra; and Alejandra's managers' awareness of her personal calls. We discuss other relevant testimony, including HSBC's workplace personal call policies and the disclosures received by Rojas for her credit card, *post*.

disclosure], and there was a risk." All three witnesses indicated agent calls were monitored to ensure compliance. Ivey and Garcia further testified failure to provide an outbound recording disclosure was grounds for employee discipline.

Ivey and Garcia, as well as Salinas department manager Escamilla, also testified HSBC policy barred call center agents from making personal calls from their desks and agents would be disciplined or subject to corrective action for this conduct.[7]

Rojas and Alejandra also testified at trial. Rojas lived with Alejandra, and Alejandra's two children (Rojas's grandchildren); Alejandra's boyfriend Enrique (the children's father); and Rojas's boyfriend. Rojas worked at J.C. Penney and assisted Alejandra with childcare on her days off. Rojas knew Alejandra worked for HSBC Card Services. Rojas had an HSBC Mastercard, and received a recording disclosure when she called HSBC to pay her bill each month. Rojas testified that if she needed to talk to Alejandra, she would call Alejandra's cell phone, Alejandra would see the missed call, and would call back on her desk phone. When Alejandra called her, Rojas did not receive "any indication" her calls were being recorded. Rojas said she "didn't have a phone number for Alejandra at her work."

Alejandra explained she would call Rojas back from her work phone, because they "weren't allowed to use [their] cell phones." She subsequently testified her boyfriend Enrique had her HSBC landline extension, and would call her at that number. Alejandra acknowledged that if her "mother . . . boyfriend, anyone . . . called in on the incoming line," the incoming call would

---

7    The video deposition testimony of Escamilla and Ramirez was played for the court.

receive a recording disclosure.

The call recordings played at trial included a call in which Rojas completed a sale to a J.C. Penney customer while talking to Alejandra, and calls to her home with others present, including one call that was "mostly a conversation between [Enrique] and Alejandra," with Rojas joining at the end. The recordings also reflected background noise at the call center, including a "voice speaking in the background on [one] call," and Rojas acknowledged Alejandra sometimes "had to speak softly" because she "didn't want the conversation to be overheard" and that, at one point, Rojas said, "Talk to me louder" and Alejandra responded, "I can't, I'm at work."

Ramirez, who was Alejandra's direct manager, testified she was aware Alejandra was making personal calls from her desk. Escamilla, who was Alejandra's "next-level manager" for a time, testified Alejandra was not permitted to make personal calls from her cubicle, but she was not aware of such calls.

C. *Statement of Decision*

After the bench trial, the trial court issued a proposed statement of decision finding in favor of HSBC. Rojas filed objections. The court adopted its proposed statement as the final statement of decision.

The trial court explained there were 106 call recordings at issue, as it accepted into evidence only the 109 recordings played during trial and Rojas declined to pursue three calls to her J.C. Penney work phone line. In ruling on Rojas's Privacy Act claims, the court determined Rojas "fail[ed] to prove the necessary elements of intent and lack of consent," which are "essential elements" under both section 632 and 632.7, and this "requires a finding in HSBC's favor on all of [her] claims." The court also found Rojas did not establish the landline communications were confidential for purposes of

9

section 632, and could not recover for cellular or cordless calls under section 632.7 for additional reasons (or seek alternative relief for those calls under § 632). In rejecting Rojas's testimony that certain calls to her home were received on the cordless handset, the court expressly found she was "not credible." The court also noted during trial that it had a "hard time believing some of [Rojas's] testimony" regarding calls not played at trial.

D.     *Judgment and Postjudgment Proceedings*

In July 2020, the trial court entered judgment for HSBC. HSBC filed its memorandum of costs. Rojas moved to strike or tax costs, which the trial court denied.

Rojas appealed from the judgment, and subsequently appealed from the order denying her motion to tax costs. We requested supplemental briefing from the parties regarding a recent California Supreme Court decision concerning recoverable costs for unused trial exhibits. (*Segal v. ASICS* (2022) 12 Cal.5th 651 (*Segal*).)

DISCUSSION

I.     <em>Rojas's Appeal From Judgment After Court Trial</em>

Rojas challenges the trial court's determinations regarding intent, consent, confidentiality under section 632, and additional rulings regarding section 632.7. She further contends the court abused its discretion by admitting into evidence and considering only call recordings played in court. We conclude that although the court's intent findings are not supported by the record, the court properly analyzed the issue of consent to record and substantial evidence supports its finding of implied consent, requiring affirmance of the judgment. We need not and do not reach Rojas's remaining arguments.

10

A.   *Overview of Applicable Law*

  1.   *California Invasion of Privacy Act*

The California Invasion of Privacy Act was enacted to " 'protect the right of privacy by, among other things, requiring that all parties consent to a recording of their conversation.' " (*Smith v. LoanMe* (2021) 11 Cal.5th 183, 191 (*LoanMe*), citing *Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 768–769 (*Flanagan*); see *Kearney v. Salomon Smith Barney, Inc.* (2006) 39 Cal.4th 95, 122 (*Kearney*) ["it is unlawful under California law for a party to a telephone conversation to record the conversation without the knowledge of all other parties to the conversation"]; *id.* at p. 125 [state has "strong and continuing interest in the full and vigorous application" of the Privacy Act].)

Section 632, subdivision (a), "provides for liability when '[a] person . . . intentionally and without the consent of all parties to a confidential communication . . . uses a[] . . . recording device to . . . record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a . . . telephone[] or other device, except a radio.' " (*LoanMe, supra*, 11 Cal.5th at p. 191.)  A "conversation is confidential" for purposes of section 632 "if a party to that conversation has an objectively reasonable expectation that the conversation is not being overheard or recorded." (*Flanagan, supra*, 27 Cal.4th at p. 768; see § 632, subd. (c) [full definition of "confidential communication"].)

"Other provisions within the statutory scheme reflect updates that have been made from time to time in response to the emergence of new communication devices." (*LoanMe, supra,* 11 Cal.5th at p. 191; *ibid.* ["The Legislature augmented the statutory scheme in 1985, 1990, and 1992 'to take account of privacy issues raised by the increased use of cellular and cordless telephones.' "].)

11

Relevant here, section 632.7, subdivision (a) provides, "Every person who, without the consent of all parties to a communication, intercepts or receives and intentionally records, or assists in the interception or reception and intentional recordation of, a communication transmitted between two cellular radio telephones, a cellular radio telephone and a landline telephone, two cordless telephones, a cordless telephone and a landline telephone, or a cordless telephone and a cellular radio telephone, shall be punished" with statutory damages and other remedies. (See *LoanMe*, *supra*, 11 Cal.5th at pp. 191–192; *id.* at p. 191, fn. 2 ["section 632.7 does not prohibit the 'intentional interception or recording' of a covered communication [citation]; it is concerned instead with the intentional recording of an intercepted or received communication"]; see also *Flanagan*, *supra*, 27 Cal.4th at p. 771, fn. 2 [§ 632.7 "applies to all communications, not just confidential communications"].)

2.      *Standard of Review*

"It is a fundamental rule of appellate review that the judgment appealed from is presumed correct." (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)

"We apply well-established standards of review to a judgment based upon a statement of decision issued after a bench trial. [Citation.] We review questions of law de novo and we review the trial court's findings of fact under the substantial evidence standard." (*Gajanan Inc. v. City and County of San Francisco* (2022) 77 Cal.App.5th 780, 791–792.)

" 'When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' "

12

(*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881, italics omitted; see *Durante v. County of Santa Clara* (2018) 29 Cal.App.5th 839, 842 (*Durante*) [" 'findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings' "]; *Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981 (*Thompson*) ["It is not our role as a reviewing court to reweigh the evidence or to assess witness credibility."].)[8]

We also "must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision," unless a party timely files objections identifying omissions or ambiguities. (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 48 (*Fladeboe*).) We review "implied factual findings under the substantial evidence standard." (*Id.* at pp. 59–60.)

Only prejudicial error is grounds for reversal. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 573–574 (*Soule*).) It is the appellant's burden to "show not only that the trial court erred, but also that the error was prejudicial . . . ." (*Hoffman Street, LLC v. City of West Hollywood* (2009) 179 Cal.App.4th 754, 772.)

---

[8] To the extent Rojas suggests disputed facts are irrelevant, and discounts them to argue factual issues were "undisputed" and subject to de novo review, rather than substantial evidence review, she is incorrect. We also reject her request in the "Conclusion" section of her opening brief that we rule on a list of issues as a "matter of law." We address issues of law to the extent warranted by the foregoing standards.

B.      *Intent to Record*

Rojas contends the trial court erred in assessing intent to record under sections 632 and 632.7, and substantial evidence does not support its finding that HSBC did not intend to record the calls between Rojas and Alejandra (see, trial court's findings on pp. 16–17, *post*). We agree substantial evidence does not support the court's findings.[9]

1.      *Additional Facts*

HSBC manager Ivey testified calls were recorded for "quality purposes" and to have evidence of what took place in conversations with merchants and consumers. Ivey, as well as HSBC managers Garcia and Escamilla, also testified HSBC prohibited call center agents from making personal calls from their desks.

Specifically, Ivey stated "personal calls were a violation of the rules" and "not allowed." He explained it was covered in training that agents could make non-recorded calls from a manager's desk (for urgent calls), and a phone bank in the lobby (for non-urgent ones). He agreed the Call Avoidance Policy, which barred "outbound personal calls from [one's] desk" was "one of the written policies that instructed employees not to make personal calls," while acknowledging it "focused on employees who were receiving [inbound] calls from customers." He said there were also "specific documents within Scout . . . that personal phone calls from [one's] desk were not allowable," but they "weren't able to be found." When asked about the Inside HR Electronic Monitoring policy's treatment of personal calls (including that they "may be

---

9      Certain of Rojas's contentions of legal error here do not accurately capture our holding in *Rojas I*, or HSBC's arguments in this appeal. Given our conclusion that substantial evidence does not support intent to record, we need not and do not discuss those contentions further.

14

recorded"), he said Scout policies were "probably more specific."[10]

Ivey further testified there was progressive discipline for violating personal call policies, which could result in an agent's termination. He "knew that call agents were making personal calls," and was aware of a half-dozen employees who were terminated for this conduct during the relevant time period. He agreed there were "potentially others" who would have been dealt with at lower management levels.

Garcia, a senior branch manager who previously worked at the Salinas facility, testified new hires were told personal calls on desk phones "were not allowed." He agreed personal calls could lead to progressive discipline ending in an employee's termination, and he had "come across an employee making a personal call," and asked them to stop. Like Ivey, he testified "there was a written policy prohibiting personal calls" in Scout, but it was missing.

Salinas facility department manager Escamilla similarly testified personal calls were not permitted in employees' work areas, but were allowed from the lobby phone bank. She also indicated employees could make cell phone calls from the lobby, cafeteria, or patio. She recalled a written "policy against personal calls," stating it "should be in one of the HR policies" and her best recollection was that it was a "company-wide" policy and also addressed cell phone use.

Ramirez, Alejandra's direct manager at the Salinas facility, also testified about personal call policies and practices. She recalled that during her own training, they were told they "really shouldn't use our phone on our desk to make personal calls," and there were lobby phones they could use, but did not remember anything in writing. She knew calls could be recorded.

---

10    Marcy, HSBC Tech Services' head of telecommunications, also testified generally that business units had "specific policies."

Ramirez testified the employees she managed were "generalists," who had more responsibility and flexibility, and they were "allowed to make personal phone calls . . . to check up on their children or if there was an emergency," but not other types of calls. Ramirez was aware Alejandra was making personal calls from her work area. She never stopped to listen, but "could hear her checking up on her children, usually." When asked if she overheard conversations with Rojas, Ramirez said she "knew [Alejandra] was talking to her mother," but did not "know what the conversation was about." Ramirez "did not feel that [Alejandra] was making a large number of calls," stating, "[I]f that had been the situation, I would have addressed it with her directly."

Alejandra addressed personal call policies and practices, as well. Her job duties at certain times included monitoring calls and updating policies, and she did not remember seeing a written policy barring personal calls from desk phones, and never worked on such a procedure. She also did not recall Ramirez telling her personal calls could not be made from her work space, and did not think personal calls had to be confined to emergencies or child care. Rather, she called Rojas when she "needed to talk to her," but acknowledged "no one ever told [her] . . . that this was an acceptable practice . . . ." She also acknowledged the Call Avoidance Policy applied to her when she was logged into the queue to receive calls.

The trial court found Rojas failed to prove HSBC's intent to record the calls between Rojas and Alejandra. The court explained: "HSBC prohibited agents (such as Alejandra) from placing personal calls . . . at their desk," noting the evidence that "HSBC had a written policy prohibiting personal calls," "informed its employees" about it, and enforced it through progressive discipline "ending in potential termination." The court also found HSBC trained employees to make personal calls on "managers' non-recorded

16

phones" or to "use a non-recorded phone or their personal cell phone away from the call center floor."  The court concluded that "[w]hile HSBC operated a recording system on its customer-service lines and intended to record the calls made thereon, this only proves [it] intended to record all business calls and is insufficient to establish intent to record [Rojas's] personal calls with her daughter made in violation of HSBC policy and without HSBC's knowledge."

Addressing an argument by Rojas that recording is intentional if there is "knowledge to a substantial certainty" that it will capture a confidential communication, the trial court said the standard "applies only to [s]ection 632" and Rojas "failed to satisfy [it] in any event . . . ."  Rather, the court stated, "HSBC implemented policies and procedures that would prevent 'confidential' communications . . . from occurring," such as informing agents their desk phones were subject to recording, using automated disclosures on incoming calls, and requiring disclosures on outbound calls to third parties. The court further stated, "Even if HSBC knew that a personal call may occasionally take place and therefore be recorded, this does not, without more, lead to the conclusion that a *confidential* communication within the meaning of Section 632 would take place because even the parties to a personal call should have reasonably expected under these circumstances that it could be overheard, monitored, or recorded."

2.    *Applicable Law*

Section 632 bars a person from "*intentionally* and without the consent of all parties to a confidential communication . . . record[ing] the confidential communication . . . ."  (§ 632, subd. (a), italics added.)  The " 'recording of a confidential conversation is intentional if the person using the recording equipment does so with the purpose or desire of recording a confidential

17

conversation, or with the knowledge to a substantial certainty that his use of the equipment will result in the recordation of a confidential conversation.' " (*Rojas I*, *supra*, 20 Cal.App.5th at p. 435 citing *Estate of Kramme* (1978) 20 Cal.3d 567, 572, fn. 5 [requisite intent is "to record a confidential communication, rather than simply an intent to turn on a recording apparatus which happened to record a confidential communication"], italics omitted).

Section 632.7 also requires a "showing that [the defendant] '*intentionally'* recorded" the communications at issue. (*Rojas I*, *supra*, 20 Cal.App.5th at p. 432, citing § 632.7, subd. (a).)

In *Rojas I*, this court reversed summary judgment for HSBC, focusing solely on intent to record. (*Rojas I*, *supra*, 20 Cal.App.5th at p. 432.) At the time, the undisputed facts were that HSBC used a "full-time telephone call recording system"; it recorded the calls " 'on purpose' "; and its Electronic Monitoring policy authorized employees to use company telephones for personal calls and advised them " 'personal calls may be recorded.' " (*Id.* at p. 433.) We held HSBC did not "establish[] as a matter of law that it did not have 'knowledge to a substantial certainty that [its] use of the equipment w[ould] result in the recordation of a confidential conversation' of an employee and a third party like Rojas." (*Id.* at p. 436.) Rather, we stated, a "reasonable trier of fact could find that HSBC had the requisite intent under sections 632(a) and 632.7(a)." (*Id.* at p. 435.) We explained: "[T]he . . . calls at issue here were not recorded ' "by chance" ' or ' "innocent[ly]." ' HSBC knew that it was recording—and, indeed, purposefully was recording—*all* of the calls, having previously told its employees that they were authorized to use HSBC telephones for personal use and that their personal calls might be recorded." (*Ibid.*)

18

3.      *Substantial Evidence Does Not Support The Trial's Court's Intent Finding*

Rojas contends the trial court finding that she failed to prove intent "does not withstand the substantial evidence test." We agree.

HSBC's trial theory was that because its workplace policies banned personal calls, it did not intend to record those calls. This theory rests on the premise that the ban *worked*, such that HSBC did not know personal calls were being made and thus recorded. The trial court accepted HSBC's theory, finding Rojas failed to prove intent because HSBC barred agents from making personal calls at their desks and the calls at issue were "made . . . without HSBC's knowledge." The court also disagreed HSBC knew confidential calls were being recorded, citing its recording disclosures and reasonable privacy expectations. But the record negates HSBC's theory, and the court's findings. Not only did HSBC policies not prevent personal calls, but HSBC managers *knew* they were happening and Alejandra's manager even permitted them. These facts, coupled with HSBC's full-time recording system, meant HSBC knew personal calls were being recorded—including any such calls that were confidential (for § 632) or received on a cellular or cordless phone (for § 632.7). The record also does not support the court's further finding that HSBC lacked substantially certain knowledge that confidential calls were being recorded. We explain.

First, to the extent HSBC had a policy barring personal calls from agents' desk phones, that does not establish such calls actually were prevented—particularly in the absence of a single, clear policy governing personal calls and uniform enforcement of those policies. HSBC managers Ivey, Garcia, and Escamilla did testify there was a written policy prohibiting such calls, but Ivey and Garcia indicated it was a Scout policy which could no longer be found, while Escamilla thought it was a company-wide HR policy

19

that addressed cell phones as well.  Ivey also testified the Call Avoidance Policy was part of the personal call ban, but acknowledged it only applied to some agents: those receiving inbound calls.  And HSBC still had in effect its global, companywide Electronic Monitoring policy, an HR policy that stated employees "may use" telephones "for occasional non-work purposes," and "personal calls may be recorded."

That Scout policies are more specific than HR policies, as Ivey testified and HSBC urges here, does not necessarily minimize confusion for a manager trying to implement both.  We also disagree with HSBC that the Electronic Monitoring policy instruction to avoid "listen[ing] to any personal calls" shows it "did not intend to record these calls in the first place."  The instruction *implies* HSBC anticipated personal calls would be recorded.

Second, and critically, there was undisputed evidence HSBC managers knew personal calls *were* being made, including by Alejandra, while HSBC concededly recorded all calls from agent's desk phones at the Salinas facility. (Cf. *Kight v. CashCall, Inc.* (2011) 200 Cal.App.4th 1377 (*Kight I*) [company was potentially liable under § 632 for supervisors' secret, live monitoring of calls; "corporation is a legal fiction that cannot act except through its employees or agents"].)  Ivey and Garcia were aware of employees who made personal calls (at least half a dozen in Ivey's case).  Regardless of whether those employees were subject to progressive discipline, HSBC's policy did not prevent all personal calls from being made.  And, some employees were simply allowed to make personal calls.  Ramirez, Alejandra's direct manager, let her agents make calls concerning children and emergencies.  Further, and significantly, Ramirez knew Alejandra was making personal calls, including to her mother (Rojas) and on unknown topics, and did not try to limit this

20

practice. Instead, Ramirez said she "did not feel [Alejandra] was making a large number" of calls.[11]

We thus disagree with HSBC that Ramirez "did not testify that she allowed [Alejandra] to make the hundreds of routine personal calls that are at issue" here. (Emphasis omitted.) That is the only reasonable inference from Ramirez's testimony. Nor are we persuaded by HSBC's contention that Ramirez's "allowance of personal calls in limited circumstances was contrary to HSBC's official policy for call center employees," pursuant to which it notes Ramirez herself was trained to make personal calls from the lobby. Ramirez did not remember a written policy barring personal calls, and presumably viewed her management practices as acceptable. If anything, her apparent failure to implement HSBC's desired personal call policy illustrates the significant risk in relying on corporate workplace policies to limit Privacy Act liability.

Third, and in turn, there is no support for the trial court's finding that HSBC lacked " 'knowledge to a substantial certainty' " that confidential calls were being recorded (i.e., the standard under section 632). The court reasoned "occasional[]" recording of personal calls did not mean confidential calls would be recorded, citing HSBC's disclosure practices (e.g., requiring agents to give third party disclosures) and stating "parties to a personal call should have reasonably expected" they could be recorded. But HSBC was recording *all* calls; HSBC manager Ivey and HSBC executive Marcy recognized there was a "risk" a disclosure would not be made; and Marcy said

---

11 Although Escamilla testified Alejandra was not allowed to make personal calls from her cubicle and she was unaware of any such calls, that does not negate Ramirez's undisputed testimony that Ramirez knowingly allowed Alejandra's personal calls.

they "knew that not all agents" were making disclosures—meaning confidential calls without disclosures would be captured. And, as we note below, whether a party has reasonable privacy expectations for confidentiality purposes turns on the "surrounding circumstances," which "may include the party's own conduct and background . . . ." (*Kight v. CashCall, Inc.* (2014) 231 Cal.App.4th 112, 133 (*Kight II*).)[12]

In sum, notwithstanding HSBC's personal call policies, HSBC knew personal calls were being made from call center agents' desk phones, and was recording any such calls that were made—whether confidential, to a cellular or cordless phone, or otherwise. We conclude this undisputed evidence established HSBC had knowledge to a substantial certainty that its full-time recording system in Salinas would result in the recording of a confidential conversation under section 632, as well as a cellular or cordless conversation under section 632.7. Rojas therefore met her burden of proof on intent, and there was no substantial evidence for the trial court's findings to the contrary.

_____

[12]    HSBC relatedly contends its disclosure policies were "expressly designed to avoid recording calls without consent," and there is liability "only for . . . recording a call without consent." HSBC's point is not entirely clear, but it appears to conflate two different issues (i.e., intent to record, and lack of consent). HSBC also did not supply a separate heading or legal authority for the point, and we do not consider it further. (Cal. Rules of Court, rule 8.204(a)(1)(B) [party's brief must "[s]tate each point under a separate heading or subheading" and "support each point by argument and, if possible, by citation of authority"]; *WFG National Title Ins. Co. v. Wells Fargo Bank, N.A.* (2020) 51 Cal.App.5th 881, 894 ["[W]e may disregard conclusory arguments that are not supported by pertinent legal authority."].)

22

However, as we explain next, substantial evidence *does* support the trial court's finding that Rojas failed to prove lack of consent to record, meaning her Privacy Act claims fail.

## C.    *Lack Of Consent*

Rojas contends the trial court applied incorrect legal standards in determining she did not prove HSBC lacked her consent to record the conversations with Alejandra.  We disagree, and further conclude substantial evidence supports the court's finding that Rojas impliedly consented to being recorded.[13]

### 1.    *Additional Facts*

Rojas had an HSBC Mastercard, and knew Alejandra worked for HSBC Card Services at a call center.  When asked if she had a "credit card with HSBC Card Services," Rojas said "yes."

HSBC's cardmember agreement contained a section titled "Monitoring Practices," which stated, "You agree that we may listen to and record phone calls between you and our representatives."  The agreement indicated "we" and "our" meant "HSBC Bank Nevada, N.A."

HSBC manager Ivey testified it was a "normal course of action, and . . . within the requirements" for the agreement to be sent to a cardmember.  Denise Mitchell, an HSBC senior manager of relationship management, offered similar stipulated testimony that it was "standard business procedure for [C]ard [S]ervices to send a copy of the cardmember agreement to the

---

13    As noted *ante* (and *post*), sections 632 and 632.7 require consent by all parties.  (§ 632, subd. (a); § 632.7, subd. (a).)  By concluding Rojas did not meet her burden on the consent issue, the trial court impliedly also found Rojas did not prove lack of consent by Alejandra.   Rojas does not dispute this implied finding, and we need not and do not reach it.

cardholder along with the credit card." She said the agreement "would have been sent with all network credit cards, including Mastercards," during the relevant time period.

Rojas testified that to make her HSBC credit card payment, she called the "1-800 number" customer service line "once a month." She would receive a disclosure that said, "This call may be recorded." When asked "what did you understand with regard to that particular call," Rojas said, "That my call will be recorded."

Rojas denied she had "any knowledge that [her] personal telephone calls [with Alejandra] were being recorded by HSBC" until this lawsuit. She also denied giving HSBC permission to record her personal calls.

The trial court found Rojas failed to prove lack of consent. The court explained she "called HSBC every month to pay her HSBC Mastercard bill," "heard an automated call recording disclosure every time," and "was or should have been aware that calls to and from HSBC's call center were likely to be recorded." The court further explained "the HSBC cardmember agreement sent to cardmembers such as [Rojas] . . . contained an express call recording disclosure." The court found "[b]oth forms of disclosure would have placed [Rojas] on notice of recording and [she] therefore impliedly consented to the recording of her calls," citing *Negro v. Superior Court* (2014) 230 Cal.App.4th 879, 892 (*Negro*) and its discussion of implied-in-fact consent. The court concluded the evidence "more than establishes this level of inquiry notice," and at least "precludes [Rojas] from meeting her burden of proving lack of consent under both Sections 632 and 632.7, as required." The court elsewhere noted Rojas "not only consented to receive the calls from HSBC," but she "also *solicited* the calls from HSBC by triggering a request that Alejandra return her call from work." (Some emphasis omitted.)

24

2.    *The Trial Court Did Not Err In Assessing Consent*

Rojas argues the trial court erred in analyzing consent, because "binding law" purportedly requires an " 'explicit advisement' at the outset of . . . recorded conversations."  She then argues the court's "application of 'implied consent' is incorrect," and the court improperly "[created] . . . a whole new construction of 'consent' " by "interpret[ing] . . . consent to mean implied consent based on 'inquiry notice . . . .' "  Rojas arguably appears to mean that, to the extent implied consent even applies under the Privacy Act, the trial court got it wrong.  Her position lacks merit.

a.    *Implied Consent Under The Privacy Act*

 As a preliminary matter, implied consent constitutes "consent" under the Privacy Act.  Sections 632 and 632.7 both require a plaintiff to prove the recording was made "without the consent of all parties," but neither section requires express consent.  (§ 632, subd. (a); § 632.7, subd. (a).)

In *Kearney, supra,* a choice of law case, the California Supreme Court tacitly acknowledged a party's consent to recording can be implied after adequate notice.  (*Kearney*, *supra*, 39 Cal.4th at pp. 99–100, 120 [reversing judgment after demurrer; California broker clients could sue Georgia company branch under § 632, which "applies when a confidential communication takes place in part in California"].)  In describing section 632, the Court explained that a "business that adequately advises all parties to a telephone call, at the outset of the conversation, of its intent to record the call would not violate" the section, reasoning that if a "party does not wish to participate . . . he or she simply may decline to continue the communication." (*Kearney,* at p. 118; *ibid.* [§ 632 "simply prohibits . . . recording the conversation without first informing all parties . . . that [it] is being

25

recorded"].) Thus, consent under the Privacy Act is implied from continued participation in the call following adequate advisement or notice.[14]

> b. *Explicit Advisement Of Recording On Each Call Is Not Required*

Rojas contends that "[t]o put a consumer on 'adequate notice' that his or her call is being monitored or recorded, binding law holds there must be an 'explicit advisement' " at the "outset of the recorded conversations," citing *Kearney* and *Kight I, supra*, 200 Cal.App.4th at page 1377. We disagree. As we shall explain, neither *Kearney*, nor *Kight I*, stands for this proposition, and multiple federal courts that have addressed the issue have determined an explicit, on-call advisement is not required under the Privacy Act.

First, the California Supreme Court stated in *Kearney* that an on-call advisement was sufficient to avoid violating section 632—not that such advisement was *required* to avoid liability under the Privacy Act. (*Kearney*, *supra*, 39 Cal.4th at p. 118.) Rojas cites language from a footnote, in which the court disagreed with the Court of Appeal that "even in the absence of an explicit advisement," clients " 'know or have reason to know' " their broker calls are recorded. (*Id.* at p. 118, fn. 10.) The court explained that "in light of the circumstance that California consumers are accustomed to being informed at the outset of a telephone call whenever a business entity intends to record the call, it appears ***equally plausible*** that, in the absence of such an advisement, a California consumer reasonably would anticipate that such a telephone call is not being recorded . . . ." (*Ibid.*, emphasis added.) But by using the phrase "equally plausible," the court preserved the other option:

---

[14]    This interpretation is consistent with section 632, subdivision (b), which excludes from statutory coverage "an individual known by all parties to a confidential communication to be . . . recording the communication."

26

a California consumer *could* assume they were being recorded. Thus, this footnote does not require an explicit advisement; it just forecloses imputed consent (i.e., one should have known). (Cf. *Negro*, *supra*, 230 Cal.App.4th at pp. 890–892 [distinguishing imputed or constructive consent, from implied-in-fact consent based on the circumstances].) Further, *Kearney* involved a judgment following demurrer, and observed the Court of Appeal there "did not cite anything in the record" for its point about client knowledge. (*Kearney*, at p. 118, fn. 10.) In cases that proceed to trial, as here, there is evidence from which a court can assess a party's knowledge about being recorded.

Second, neither *Kight I*, nor our later decision in *Kight II*, held an on-call recording disclosure is required; indeed, these cases make clear that prior disclosures are relevant to expectations regarding monitoring and recording under the Privacy Act. In *Kight I*, we reversed a summary adjudication ruling that live, secret monitoring did not violate section 632, holding the statute applied and there were triable issues of material fact as to confidentiality, including whether plaintiffs reasonably expected "conversations would not be secretly monitored." (*Kight I*, *supra*, 200 Cal.App.4th at p. 1383; *id.* at p. 1396 ["The issue whether there exists a reasonable expectation that no one is secretly listening to a phone conversation is generally a question of fact that may depend on numerous specific factors, such as whether the call was initiated by the consumer or whether a corporate employee telephoned a customer, the length of the customer-business relationship, the customer's prior experiences with business communications, and the nature and timing of any recorded disclosures"].) In rejecting the defendant's argument that a " 'warning message 'at the outset' of [the] 'borrower/lender relationship' " precluded

27

confidentiality, we said this did "not establish *as a matter of law* plaintiffs were adequately warned . . . all future calls . . . may be monitored and recorded" and cited the *Kearney* footnote. (*Id.* at p. 1399, italics modified.)

In *Kight II*, we affirmed a decertification order, and confirmed monitoring expectations for confidentiality purposes turn on one's particular circumstances—including for those who did not receive on-call disclosures. (*Kight II*, *supra*, 231 Cal.App.4th at p. 133 ["surrounding circumstances . . . may include the party's own conduct and background"]; *id.* at p. 130 [plaintiffs had "ongoing business relationship with the defendant" and "many . . . may have heard a monitoring disclosure statement at least once"]; *id.* at p. 132 ["Although the outbound calls did not include a disclosure message, . . . individual issues remain for outbound-call class members regarding the reasonableness of the claimed expectation of privacy under the circumstances."]; cf. *Hataishi v. First Am. Home Buyers Protection Corp.* (2014) 223 Cal.App.4th 1454, 1457, 1467 [affirming denial of class certification for outbound call recipients; "[N]othing in the language of [§] 632 or the case law interpreting 'confidential communication' suggests that recording a conversation without advising the other party constitutes a per se violation of the statute"].)

Finally, multiple federal court opinions, which we find persuasive, have held that consent can be implied under the Privacy Act without an explicit advisement on each call.[15] (See, e.g., *Maghen v. Quicken Loans Inc.* (S.D.Cal. 2015) 94 F.Supp.3d 1141 (*Maghen I*), affirmed at *Maghen v.*

---

[15] "Decisions of . . . the lower federal courts," although not controlling on state law issues, may "be instructive to the extent we find their analysis persuasive . . . ." (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 175.)

*Quicken Loans Inc.* (2017) 680 Fed.Appx. 554, 555 (*Maghen II*) [plaintiff's consent to recording shown by, inter alia, agreement to terms of service and employee informing plaintiff at outset he worked for Quicken and was calling about online inquiry]; *Moledina v. Marriott Int'l, Inc.* (C.D.Cal. Oct. 17, 2022) ___F.Supp.3d___, 2022 WL 16630276, at *7 (*Moledina*) ["surrounding circumstances" indicated plaintiff "implicitly consented to being recorded"]; *Torres v. Nutrisystem, Inc.* (C.D.Cal. 2013) 289 F.R.D. 587, 594–595 (*Torres*) [denying class certification; consent would require individualized inquiries].)[16]

*Maghen I* is instructive. The plaintiff requested information from Lending Tree and received calls from one of its network lenders, Quicken. (*Maghen I, supra,* 94 F.Supp.3d at p. 1143.) The calls were recorded, and Maghen sued Quicken under the Privacy Act. (*Ibid.*) The district court

---

[16]   (See also, e.g., *Brinkley v. Monterey Financial Services, LLC* (S.D.Cal. Sept. 8, 2022) 2022 WL 4111871 (*Brinkley*), at *7 ["individual issues of consent," based on "nature, extent, and frequency" of phone calls prior to first call recorded without disclosure, predominated]; *AJ Reyes v. Educ. Credit Mgmt. Corp.* (S.D.Cal. May 19, 2016) 2016 WL 2944294, at *6 ["prior awareness of a practice to record may be sufficient to demonstrate consent to being recorded in the future," but is question of fact]; *Horowitz v. GC Services Ltd. P'ship.* (S.D.Cal. Dec. 12, 2016) 2016 WL 7188238, at p. *15 [warning at outset of conversation is sufficient, but not always necessary]; but see, e.g., *Mendell v. Am. Med. Response, Inc.* (S.D.Cal. Mar. 23, 2021) 2021 WL 1102423, at *6 [finding commonality as to consent; "how to interpret *Kearney* itself is a common question of law"]; *Steven Ades & Hart Woolery v. Omni Hotels Mgmt. Corp.* (C.D.Cal. Sept. 8, 2014) 2014 WL 4627271, at *12 [finding commonality as to consent; citing *Kearney,* but noting "absence of any evidence of advance notice"]; *Membrila v. Receivables Performance Mgmt., LLC* (S.D.Cal. Apr. 6, 2010) 2010 WL 1407274, at *3 [denying motion to dismiss, based on lack of advisement at outset of call].)

granted summary judgment, ruling in part that the plaintiff's "agreement to Lending Tree's Terms of Use [was] sufficient to establish consent." (*Id.* at p. 1146; *id.* at p. 1143 [Terms of Use stated network lender "may [contact you] . . . by telephone (on a recorded line)"].) The court explained: "Although a warning at the outset of a conversation is sufficient to comply with Section 632.7, it is not necessary to do so in every circumstance," noting *Kearney* did "not hold[] that such advisement is required to the exclusion of all other forms of notification." (*Ibid.*) The court continued: "To adopt such a requirement based on the language of *Kearney* would be to impose a much more restrictive standard than that required on the face of Section 632.7." (*Ibid.*; see also *White v. FIA Card Servs., N.A.* (S.D.Cal. Feb. 26, 2013) 2013 WL 756292, at \*5 (*White*) [rejecting reliance on *Kearney* to preclude consent based on cardmember agreement; declining to create "verbal disclosure requirement that is not expressly provided by the statute itself"].)

c. *Trial Court Did Not Incorrectly Apply Implied Consent*

Rojas next contends the "explanation of implied consent" in *Griggs-Ryan v. Smith* (1st Cir. 1990) 904 F.2d 112 (*Griggs-Ryan*) is "instructive"; it focuses on "knowing[] agree[ment] . . . to the surveillance"; and the trial court "disregarded" this standard. She argues the court improperly "[created] . . . a whole new . . . consent" standard based on " 'inquiry notice,' " and factors like whether she "should have been aware" of recording. We agree *Griggs-Ryan* provides guidance on implied consent, but disagree the trial court erred in analyzing implied consent here.

First, *Griggs-Ryan* involved the federal wiretapping law, under which it is "not unlawful . . . for a person . . . to intercept a . . . communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception." (18 U.S.C.

§ 2511(2)(d).)  Federal courts have "uniformly held . . . implicit consent will satisfy" such consent.  (*Berry v. Funk* (D.C. Cir. 1998) 146 F.3d 1003, 1011 (*Berry*).)  In *Griggs-Ryan*, the First Circuit affirmed summary judgment for defendants in an action by a tenant who impliedly consented to his landlady's interception of his calls.  (*Griggs-Ryan*, *supra*, 904 F.2d at pp. 113, 119; *id.* at p. 117 [tenant was "repeatedly informed that all incoming calls were being monitored"].)  The court explained:

> "[I]mplied consent is 'consent in fact' which is inferred 'from surrounding circumstances indicating that the [party] knowingly agreed to the surveillance.'  [Citations.] . . . The circumstances . . . will vary from case to case, but . . . will ordinarily include language or acts which tend to prove (or disprove) that a party knows of, or assents to, encroachments on the routine expectation that conversations are private."

(*Griggs-Ryan* at pp. 116–117; accord, *Negro, supra,* 230 Cal.App.4th at p. 892 [describing implied consent standard in wiretapping context, quoting *Griggs-Ryan*]; see *Berry*, at p. 1009 ["The key question in such an inquiry obviously is whether parties were given sufficient notice."].)[17]

Federal cases have cited *Griggs-Ryan* and *Negro* (or cases using similar language) in addressing implied consent under the Privacy Act, and we conclude this application was appropriate.  (See, e.g., *Brinkley*, *supra*, 2022

---

[17]    Rojas argues the trial court mistakenly cited *Negro,* because it is a Stored Communications Act (SCA) case and supports a narrow view of consent here.  *Negro* is an SCA case, but addressed consent arguments that related to federal wiretap law and suggested the *SCA context* warranted the narrower view of consent.  (*Negro, supra*, 230 Cal.App.4th at p. 889 ["the context in which the consent issue is likely to arise in cases like this one militates in favor of a narrower conception of consent, not a broader one"].)  As for the trial court, it cited the page of *Negro* describing implied consent, which, as noted, quoted *Griggs-Ryan*—the standard Rojas urges is "instructive."  (*Id.* at p. 892.)

WL 4111871, at *5  ["[§] 632.7 does not define 'consent,' which may be implied"; citing *Negro*]; *Nei Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.* (S.D.Cal.  Sept. 15, 2016) 2016 WL 4886933, at *3 [citing *Griggs-Ryan* and *Negro*, inter alia, for implied consent standards]; cf. *Moledina, supra*, 2022 WL 16630276, at *7 [implied consent can exist where " 'surrounding circumstances indicat[e] that the party to the call knowingly agreed to the surveillance' "].)[18]

Second, Rojas does not establish the trial court failed to apply the foregoing implied consent standards.  The court's analysis reflects it focused on specific circumstances that showed Rojas knew HSBC recorded calls (e.g., disclosures in the cardmember agreement and her monthly payment calls), and found "[b]oth forms of disclosure would have placed [her] on notice of recording," such that her continued participation in calls from HSBC established her implied consent to recording of the calls.  (See *Griggs-Ryan*, *supra*, 904 F.2d at pp. 117–118; *Negro*, *supra*, 230 Cal.App.4th at p. 892; see *Berry*, *supra*, 146 F.3d 1003, at p. 1011 ["key question" is "whether parties

---

[18]    Neither party addressed legislative history in discussing implied consent.  On our own motion, we take judicial notice of the history of the enacting legislation for sections 632 and 632.7, solely to note it does not aid our analysis.  (§ 632 [Assem. Bill No. 860; Stats. 1967, ch. 1509]; § 632.7 [Assem. Bill No. 2465; Stats. 1992, ch. 298].)  We located a reference to "implied consent," in the Comments section of an Assembly Bill Digest report for Assem. Bill No. 860.  The section poses comments and questions, including:  "Does the consent provided for in [sections] 631 and 632 have to be express, or can it be implied? If implied consent is sufficient then serious problems might arise regarding what actually constitutes implied consent."  The source of this question is not identified, and no answer follows.  We observe the cases discussed herein make it clear that coherent standards for assessing implied consent in fact exist and are readily applied by courts under established authority.

were given sufficient notice"].)  Accordingly, although the court used the terms "inquiry notice" and "should have been aware," its analysis shows it properly considered implied-in-fact consent.  (Civ. Code, § 3528 ["The law respects form less than substance"]; see *Boysaw v. Superior Court* (2000) 23 Cal.4th 215, 220 [rejecting interpretation of order that would "exalt form over substance"].)  Indeed, the court cited *Negro*'s discussion of implied-in-fact consent and there is nothing to suggest it based its findings on Rojas's hypothetical, rather than actual, knowledge of HSBC's recording practices.  (Compare *Kearney*, *supra*, 39 Cal.4th at p. 118, fn. 10 [Court of Appeal "did not cite anything in the record" for its finding that clients " 'know or have reason to know' " broker calls were recorded].)  Further, while we conclude there was no legal error, any such error (assuming it occurred) would have been harmless, because substantial evidence still supports the court's consent findings, as we discuss in the next section.  (*Soule*, *supra*, 8 Cal.4th at pp. 573–574 [only prejudicial error supports reversal]; cf. *Am. Federation of State etc. Employees v. County of Los Angeles* (1983) 146 Cal.App.3d 879, 887 [affirming trial court despite erroneous collateral estoppel ruling, where record supported judgment, and deeming the error harmless].)

      3.      *Substantial Evidence Supports The Trial Court's Consent Finding*

We now turn to the record and, as we must, we consider all evidence, and draw all inferences, in favor of the judgment.  (*Durante*, *supra,* 29

Cal.App.5th at p. 842.)[19] Substantial evidence supports the trial court's finding that Rojas impliedly consented to the recording of Alejandra's calls from HSBC, and therefore did not prove lack of consent under the Privacy Act (§ 632, subd (a); § 632.7, subd. (a).)

First, the record supports the trial court's finding that Rojas was "placed . . . on notice"—that is, she was notified—that the calls at issue were subject to recording. Rojas testified she had an HSBC credit card, and knew Alejandra worked for HSBC at a call center. Thus, Rojas knew the *same company* both issued her credit card and ran the call center from which Alejandra called her. And, as the trial court found, Rojas's cardmember agreement for her HSBC credit card and her monthly payment calls disclosed that HSBC records calls. On these facts, the court could find Rojas was notified that, and therefore knew, the calls from Alejandra at HSBC were subject to recording.

We reject Rojas's claim that the disclosures did not provide meaningful notice of recording. We do not reweigh the evidence (*Thompson, supra,* 6 Cal.App.5th at p. 981), and Rojas's specific objections lack merit. On the cardmember agreement, she contends it states, "You agree that we may listen to and record phone calls between you and our representatives," and "we" is defined only as HSBC Bank Nevada, N.A., not HSBC Card Services or

---

19    Although Rojas objected below that the trial court did not address certain facts (e.g., HSBC did not use automatic outbound disclosures; the cardmember agreement was with HSBC Bank Nevada, N.A.), this does not impact our review. The court was only required to state ultimate facts (*Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 500); it did so, finding Rojas failed to prove lack of consent, due to her implied consent; and we review that finding for substantial evidence. (*Fladeboe, supra,* 150 Cal.App.4th at pp. 59–60.)

HSBC Tech Services.  But the agreement includes consent for "representatives," which encompasses employees of HSBC Card Services, like Alejandra—and places no limit on the types of "phone calls" with such representatives being recorded.  Further, the issue is not whether HSBC Card Services or HSBC Tech Services are parties to the agreement.  It is whether this HSBC document made *Rojas* aware Alejandra's calls to her from HSBC were recorded, and the trial court could find that it did.  (See *Maghen I*, *supra*, 94 F.Supp.3d at p. 1145 and fn. 3 [disagreeing "Lending Tree's Terms of Use [were] vague and ambiguous because [it] does not list Quicken"; plaintiff's "argument that he did not connect his agreement to Lending Tree's Terms of Use and Quicken's phone call is unavailing"]; cf. *White*, 2013 WL 756292, at pp. *3,*5 [agreement stating defendant "may monitor and record" and referring to defendant's "affiliates, or its marketing associates" sufficiently disclosed calls would be recorded]; cf. *id*. at p. *6 [rejecting argument that agreement did not state "*every* telephone call will be recorded"; whether it stated defendant "will record every . . . call or may record any . . . call ha[d] no effect," as plaintiff "consented to the possibility that her telephone calls will be recorded in either circumstance"].)

As for the payment calls, Rojas argues the message only said "may be recorded," and did not address future or personal calls.  Rojas testified she understood "may be recorded" meant the particular call *was* being recorded, and that she made payment calls once per month—meaning she was being reminded about HSBC's recording practices on a continuing basis.  (Cf., e.g., *Torres*, *supra*, 289 F.R.D. at p. 594 [contrasting caller who heard disclosure "several months prior," from caller who heard disclosure on preceding call].)  The fact that the recording disclosure on her monthly calls to HSBC did not address personal calls does not help Rojas, either.  By stating the call "may be

35

recorded," the disclosure warns *all* calls may be recorded, regardless of content. (Cf. *White*, *supra*, 2013 WL 756292, at pp. *5–*6.)[20]

Second, Rojas participated in numerous calls with Alejandra made from an HSBC call center phone, after receiving the prior recording disclosures. (See *Griggs-Ryan*, *supra*, 904 F.2d at p. 114 [tenant continued to receive calls after being advised of recording by landlady]; cf. *Kearney*, *supra*, 39 Cal.4th at p. 118 [if a "party does not wish to participate . . . he or she simply may decline to continue the communication"].)  Indeed, as the trial court found, the record shows Rojas effectively *solicited* such calls.  Although Alejandra could receive inbound calls, did receive them from her boyfriend, and agreed such calls had automatic recording disclosures, Rojas would call Alejandra's cell phone and Alejandra would call her back from her HSBC line—with no automatic recording disclosure.  Regardless of why Rojas called Alejandra in this manner, the trial court could find she was aware of HSBC's recording practices from the prior disclosures, and chose to receive calls from an employee at HSBC (Alejandra).[21]

Finally, we recognize Rojas testified she did not know she was being recorded, and would not have continued the calls had she known.  But the trial court could impliedly reject this testimony as not credible, or weigh the

---

[20]  Rojas contends HSBC could have included an automatic disclosure or beep on outbound calls.  As discussed *ante*, on-call disclosures may limit a company's Privacy Act liability, but the absence of such disclosures does not foreclose a party's implied-in-fact consent to recording for purposes of the Privacy Act.  (See *Kearney*, 39 Cal.4th at p. 118 [on-call advisement precludes violation under § 632]; cf. *LoanMe*, *supra*, 11 Cal.5th at p. 201 [party "can avoid liability under [§ 632.7] by taking reasonable precautions, such as obtaining the consent to record the statute requires"].)

[21]  The dissent does not address all of the evidence discussed herein, including the manner in which Rojas received the calls.

evidence regarding the prior disclosures more heavily than these denials. We do not revisit credibility findings, or, as noted, reweigh the evidence. (*Thompson*, *supra*, 6 Cal.App.5th at p. 981.)

We conclude substantial evidence amply supports the trial court's finding that Rojas impliedly consented to HSBC's recording, and thus did not prove lack of consent. Because lack of consent is a required element under both section 632 and section 632.7, we must affirm the judgment for HSBC. As a result, we need not reach Rojas's remaining arguments for reversal of the judgment.

II. *Rojas's Appeal from Denial of Motion to Strike Or Tax Costs*

Rojas appeals from the trial court's postjudgment order denying her motion to strike or tax costs. She contends HSBC's section 998 order was invalid, and the court also erred in awarding certain expert costs, purportedly failing to consider her economic situation in setting those costs, and awarding costs for unused trial exhibits. We reject each argument.

A. *Additional Facts*

1. *HSBC Makes A Section 998 Offer And Later Seeks Costs*

HSBC made a section 998 offer to Rojas in June 2019, after remand in *Rojas I.* The offer stated in relevant part:

> "[D]efendants [HSBC Card Services] and [HSCB Tech Services] hereby offer to compromise and settle all claims of plaintiff Dalia Rojas ("Plaintiff") against HSBC in the above-captioned action, on the following terms: 1. Within thirty (30) days of written acceptance of this offer, HSBC agrees to pay $11,000.00 to Plaintiff; [¶] 2. Upon acceptance of this offer and within ten (10) days from receipt of the above-referenced payment, Plaintiff will dismiss with prejudice her claims in the above-captioned action, against HSBC and release HSBC of all liability to Plaintiff; and [¶] 3. Each party will bear its own attorneys' fees and costs."

Rojas did not accept the offer.

37

After receiving a full defense judgment, HSBC filed a memorandum of costs, seeking $61,716.90.  Pertinent here, HSBC requested $40,720.09 for "[e]xpert witness fees per . . . section 998," for its expert Darlene Geller-Stoff. This included $34,800 for opinion services, $831.25 for testimony at trial, $2,400 for travel time, and $2,688.84 for expenses (i.e., "airfare, ground transportation, and lodging for trial") (expert costs).  HSBC also requested $8,528.97 for "[m]odels, enlargements, and photocopies of exhibits" (exhibit costs).

### 2. *Rojas Moves To Strike Or Tax Costs*

Rojas moved to strike or tax costs.  She argued the section 998 offer did not "limit the release to liability arising from . . . the pending lawsuit," and was invalid, HSBC's expert costs were thus unavailable, and these costs also were not necessary or reasonable.  She also argued the court could consider her resources to assess the reasonableness of the award amount, and she was in the " 'extremely low' income category" for her county.  She provided a declaration stating that since she retired from J.C. Penney in 2016, her only income each month was a military pension of $864.90 and an alimony payment of $300; this "income barely covers [her] necessary living expenses"; and she has "no other economic resources readily available to [her]."  Finally, Rojas contested the exhibit costs, stating "HSBC used only approximately thirty percent of the exhibits" at trial, and provided a counsel declaration which asserted this thirty percent figure and identified the numbers of listed (488) and admitted exhibits (145).

### 3. *HSBC's Opposes Rojas's Motion To Strike Or Tax Costs*

HSBC filed an opposition, which maintained the section 998 offer was valid and the claimed costs were reasonable.  It noted 302 of the 488 listed exhibits were call recording transcripts which Rojas sought to be admitted

38

into evidence. HSBC also provided a declaration from counsel John Loftus, which attached "copies of the invoices for time spent by [expert] Geller-Stoff in preparing for trial, traveling to trial and testifying at trial." The declaration attached receipts and invoices for photocopied trial exhibits, as well.

### 4. *Trial Court Denies Rojas's Motion And Awards Costs*

The trial court denied Rojas's motion, and awarded HSBC's requested costs of $61,716.90.

First, the trial court determined the section 998 offer was valid. The court stated the offer was "unambiguous and not susceptible to [Rojas's] interpretation," but, rather, "applies to [her] claims in this action – not any other present or future claims she has or might have." The court elaborated:

> "Here, the 998 Offer is plainly between Plaintiff and Defendants and facially references only this lawsuit. Defendants clearly intended that Paragraph 2's liability release provision be narrowly applied to Plaintiff's claims in this lawsuit rather than hypothetical claims in other current or future actions. Paragraph 2, read in conjunction with the introductory paragraph, is clearly one term to Defendants' "offer to compromise and settle all claims of plaintiff Dalia Rojas against HSBC *in the above-captioned action. . . .*' Moreover, Paragraph 2's language immediately preceding the liability release provision alludes only to Plaintiff's 'claims in the above-captioned action.'"

Second, the trial court denied Rojas's request to strike or tax the expert costs. It noted post-offer expert costs are available under section 998. It then found the costs were "facially proper charges," and the costs memorandum "constitutes prima facie evidence that the costs are proper and necessarily incurred." Rojas "[bore] the burden of providing competent evidence that the costs are unnecessary or unreasonable," but "fail[ed] to do so" and "merely questions the reasonableness of various" cost entries. The court further determined that even if Rojas had met her burden, it would have denied her

39

request.  The court explained HSBC "provided substantial evidence in [its] opposition—despite having no obligation to do so—establishing that [Geller-Stoff]'s fees were reasonably necessary to the conduct of the litigation and reasonable in amount," citing the Loftus declaration exhibits.  The court found this evidence was "sufficiently specific to allow [Rojas] and the court to determine the reasonableness of [Geller-Stoff's] fees."  It also noted Geller-Stoff's "lodging and meals should be allowable costs since she traveled from Georgia . . . ."

Third, the trial court indicated it had discretion to "consider [Rojas's] economic situation in fashioning a reasonable award of costs" under section 998.  However, it could not "conclude on the current record that [Rojas] is incapable of paying [HSBC's] expert witness fees."  The court explained, "She provides bare declaratory testimony as to her monthly income, yet no information regarding, inter alia, her monthly expenses or ability to obtain financial assistance from third parties.  It addressed this issue at the costs hearing, too, stating in part, "While I appreciate that [she] has indicated her monthly income is what it is, . . . . her declaration was just too vague about her financial circumstances . . . ."

Finally, the trial court denied Rojas's request to strike or tax costs for exhibits not used at trial.  It explained exhibit-related costs "are allowable . . . provided they were reasonably helpful to aid the trier of fact," citing Code of Civil Procedure section 1033.5, subdivision (a)(13).  It acknowledged the then-existing split of authority as to costs for unused exhibits, and stated the Court of Appeal decision in *Segal v. Asics America Corp.* (2020) 50 Cal.App.5th 659, which allowed them, was the "most persuasive and well-reasoned."  The court then found the exhibit costs here were "reasonable and necessary, and reasonably helpful to aiding the trier of fact."  As we discuss

*post,* the California Supreme Court subsequently resolved the split in *Segal, supra,* 12 Cal.5th at p. 657, and held unused exhibit costs may be recoverable, albeit on more limited grounds than stated in the Court of Appeal decision.

B.     *Applicable Law*

A "prevailing party is entitled as a matter of right to recover costs in any action or proceeding." (Code Civil Proc., § 1032, subd. (b).)

"Code of Civil Procedure section 1033.5 sets forth the items that are and are not allowable as the costs recoverable by a prevailing party . . . . 'as a matter of right.' " (*Chaaban v. Wet Seal, Inc.* (2012) 203 Cal.App.4th 49, 52 (*Chaaban*); Code Civ Prov. § 1033.5, subd. (a) [items allowable as costs], subd. (b) [items not allowable as costs].)  "The statute also authorizes the trial court in its discretion to award or deny an item of costs not mentioned in this section." (*Segal, supra,* 12 Cal.5th at p. 658, citing § 1033.5, subd. (c)(4).)

"All costs, whether expressly permitted under [Code of Civil Procedure] section 1033.5, subdivision (a) or awarded in the trial court's discretion pursuant to section 1033.5(c)(4), must be 'reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation' (§ 1033.5, subd. (c)(2)) and 'reasonable in amount' (§ 1033.5, subd. (c)(3))." (*Segal, supra,* 12 Cal.5th at p. 658.)

The opposing party may move to strike or tax costs. (Code Civ. Proc. § 1034 ["Prejudgment costs . . . shall be . . . contested in accordance with rules adopted by the Judicial Council."]; *Kaufman v. Diskeeper Corp.* (2014) 229 Cal.App.4th 1, 8 ["[California Rules of Court,] [r]ule 3.1700(b) establishes a procedure for contesting costs by means of a motion to tax costs"].)

We "review a trial court's determination on which costs are reasonably necessary and reasonable in amount under the abuse of discretion standard."

41

(*Charton v. Harkey* (2016) 247 Cal.App.4th 730, 739; see *Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1339 [" ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason." ' "].)

In addition, " '[a] prevailing party who has made a valid pretrial offer pursuant to Code of Civil Procedure section 998 is eligible for specified costs, so long as the offer was reasonable and made in good faith.' " (*Najera v. Huerta* (2011) 191 Cal.App.4th 872, 877 (*Najera*).) The purpose of section 998 is to "encourage the settlement of litigation without trial, by punishing the party who fails to accept a reasonable settlement offer from its opponent." (*Elite Show Services, Inc. v. Staffpro, Inc.* (2004) 119 Cal.App.4th 263, 268 (*Staffpro*); see *Ignacio v. Caracciolo* (2016) 2 Cal.App.5th 81, 86 (*Ignacio*) [§ 998 "establishes a procedure for shifting . . . costs upon a party's refusal to settle"].) To be valid, a section 998 offer must, among other things, "not dispose of any claims beyond the claims at issue in the pending lawsuit." (*Chen v. Interinsurance Exchange of the Automobile Club* (2008) 164 Cal.App.4th 117, 121 (*Chen*).) "The burden is on the offering party to demonstrate that the offer is valid under section 998." (*Ignacio*, at p. 86.)

"We independently review whether a section 998 settlement offer was valid." (*Ignacio, supra,* 2 Cal.App.5th at p. 86.)[22]

---

[22] Whether a section 998 offer was reasonable and made in good faith are issues reviewed for abuse of discretion (*Najera, supra,* 191 Cal.App.4th at p. 877), but they are not before us. Rojas does not dispute reasonableness, and did not raise good faith until her reply brief. We deem the point forfeited. (*American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453 ["[p]oints raised for the first time in a reply brief will ordinarily not be considered"].)

C.     *Analysis*

1.     *The Section 998 Offer Was Valid*

Most of Rojas's costs arguments involve the section 998 offer, thus we begin there.  First, she argues the offer was invalid, because the "most logical interpretation" is that the phrase " 'release HSBC of all liability to Plaintiff' goes beyond the scope of the current lawsuit . . . ."  We disagree.

"In interpreting a section 998 offer, general contract principles apply when they neither conflict with nor defeat the statute's purpose of encouraging the settlement of lawsuits prior to trial."  (*Staffpro, supra*, 119 Cal.App.4th at p. 268.)  We " 'focus[] on the usual and ordinary meaning of the language used and the circumstances under which the agreement was made.' "  (*Chinn v. KMR Property Management* (2008) 166 Cal.App.4th 175, 183–184 (*Chinn*), disapproved on another ground in *DeSaulles v. Community Hospital of Monterey Peninsula* (2016) 62 Cal.4th 1140, 1158.)  The "meaning of a contract must be derived from reading the whole of the contract, with individual provisions interpreted together . . . ."  (*Zalkind v. Ceradyne, Inc.* (2011) 194 Cal.App.4th 1010, 1027; see *Bravo v. RADC Enterprises, Inc.* (2019) 33 Cal.App.5th 920, 923 ["we read documents to effectuate and harmonize all contract provisions"].)  A contract is ambiguous only if it "is susceptible of more than one reasonable interpretation."  (*Fremont Indemnity Co v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 114.)

Here, the opening paragraph of the section 998 offer states HSBC Card Services and HSBC Tech Services "offer to . . .  settle all claims of plaintiff Dalia Rojas  . . . against HSBC in the above-captioned action on the following terms."  The offer then sets forth the terms: an $11,000 payment to Rojas (paragraph 1); a provision requiring each party to bear its own attorney's fees and costs (paragraph 3); and, pertinent here, paragraph 2:  "Plaintiff will

dismiss with prejudice her claims in the above-captioned action, against HSBC and release HSBC of all liability to Plaintiff."  HSBC disagrees, contending "each of the numbered 'terms' in the offer plainly relates to the 'claims of [Plaintiff] against HSBC in the above-captioned action' " discussed in the opening paragraph.  Applying the interpretive principles above, we conclude only HSBC's interpretation is reasonable and the offer is unambiguous.

Both the plain language of the offer, and its structure, reflect it applies only to this case.  The opening paragraph expressly states the offer is to settle "claims . . . in the above-captioned action," based on terms it then sets forth. The terms in paragraphs 1 and 3 are plainly limited to this case.  In Paragraph 1, HSBC agrees to make an $11,000 payment to Rojas; HSBC was not promising to make future payments to her.  Paragraph 3 requires the parties to bear their own fees and costs; the parties were not agreeing to forego fees and costs in future actions.  Viewing paragraph 2 in light of the opening paragraph's language, and the operation of the other terms, the entire paragraph must be construed as limited to this case—not just the "will dismiss" portion, as Rojas urges.  If anything, the repetition of "above-captioned action" in paragraph 2 emphasizes the offer's limits.  (Cf. *Linthicum v. Butterfield* (2009) 175 Cal.App.4th 259, 272 (*Linthicum*) ["The terms costs, fees and 'mutual dismissal' are obviously limited to the instant lawsuit.  There is no reason to interpret the term 'all current claims' found in the same sentence as referring to anything other than the same lawsuit."]; *Chen, supra,* 164 Cal.App.4th at p. 123 [criticizing "selective[] quoting" of the settlement offer].)

*Goodstein v. Bank of San Pedro* (1994) 27 Cal.App.4th 899 (*Goodstein*), is instructive.  The defendant bank in a slander of title and negligence action

made a section 998 offer stating: " 'In full settlement of this action, [Bank] hereby offers to pay [Goodstein] the total sum of $150,000 in exchange for each of the following: [¶] 1. The entry of a Request for Dismissal with prejudice on behalf of the Plaintiff in favor of [Bank]; [¶] 2. The execution and transmittal of a General Release by [Goodstein] in favor of [Bank]; [¶] 3. Each party is to bear their own respective costs and attorney's fees.' " (*Id.* at p. 905.)  The defendant prevailed and received expert costs.  Affirming costs, the Court of Appeal disagreed the general release "required [the plaintiff] to surrender 'other present and future possible causes of action against the defendant . . . .' " (*Id.* at p. 907.)  Rather, the "clear and unambiguous language of the offer provide[d] that the terms and conditions applied only 'in full settlement of this action' " and "reasonably cannot be construed to apply to other litigation  . . . ." (*Ibid.*)

Here too, "clear and unambiguous language" in the opening paragraph limits the rest of HSBC's offer to the instant case—meaning the liability release in paragraph 2 "reasonably cannot" extend to future litigation. (*Goodstein*, *supra*, 27 Cal.App.4th at p. 907.)

Rojas argues *Goodstein* is distinguishable, because "there are specific wording and phrasing distinctions," as the offer there did not say "action" in either the dismissal or release provisions (showing, she claims, that both referred to the opening paragraph) and used the term "general release" (not "all liability").  "But *Goodstein's* point is not that a section 998 offer must contain any particular language.  Instead, its point is that the general rules of contract construction apply to section 998 offers." (*Linthicum*, *supra*, 175 Cal.App.4th at p. 272; *ibid.* [rejecting attempt to distinguish offer because it "contain[ed] no language similar to 'in full settlement of this action' "].)

Rojas's remaining arguments are not persuasive, either.

45

First, she contends the trial court's determination that the offer was "unambiguous and not susceptible to [her] interpretation" was "contrary to the law that the offer must be strictly construed in favor of [her]." (See *Sanford v. Rasnick* (2016) 246 Cal.App.4th 1121, 1129 [a "section 998 offer must be strictly construed in favor of the party sought to be subjected to its operation"].) We disagree. Courts construe language for or against a party when other interpretive principles have been exhausted. (*Chinn*, *supra*, 166 Cal.App.4th at p. 184 [addressing § 998 offers; citing rule under Civ. Code, § 1654 that " 'In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist.' "].) Here, because the offer is unambiguous, no construal of ambiguity is needed.

Second, Rojas argues that if HSBC had "intended to clearly limit" the liability release to this case, it would have said "release HSBC of all liability to Plaintiff related to the above-entitled action." (See *Auburn Woods I Homeowners Assoc. v. State Farm Gen. Ins. Co.* (2020) 56 Cal.App.5th 717, 726 [release provision referenced "the ACTION"].) She also argues "HSBC's intent to expand the release beyond . . . this action is further illustrated by [its] use of the word 'liability' as opposed to 'claim,' " citing dictionary definitions of the terms. We reject these arguments, too. No "particular language" is required for a section 998 offer, and HSBC's offer, viewed as a whole, was unambiguous. (*Linthicum*, *supra*, 175 Cal.App.4th at p. 272; see *Berg v. Darden* (2004) 120 Cal.App.4th 721, 731 [no " 'magic language' " is needed].)

Finally, the cases cited by Rojas are distinguishable. Unlike here, the offers in those cases encompassed litigants or claims beyond the present action. (See *Valentino v. Elliott Sav-On Gas Inc.* (1988) 201 Cal.App.3d 692,

46

694–698, 702 [defendant gas station won personal injury lawsuit and recovered costs under § 998, and Court of Appeal reversed; offer released the gas station, its attorney, and its insurance carrier on claims unrelated to the lawsuit, thus diluting the payment term and making it difficult to value]; *Chen, supra,* 164 Cal.App.4th at pp. 121–122 and fn. 5 [where homeowners sued based on two of three insurer claims, and insurer made § 998 offer to release "all claims," offer was ambiguous and invalid]; *Ignacio, supra,* 2 Cal.App.5th at pp. 83–84, 88 [§ 998 offer attaching two page release with "incredibly broad" language "encompass[ing] numerous claims . . . beyond those at issue in the lawsuit" was invalid].)

2. *The Trial Court Did Not Err in Awarding Expert Costs*

Rojas next contends the trial court "erred by allowing expert costs that were not supported by sufficient evidence showing that the fees charged were reasonable or that the charges were reasonably necessary . . . ." She does not establish any abuse of discretion by the trial court.

First, the trial court did not err by concluding Rojas failed to meet her burden in challenging HSBC's costs. "If items on a memorandum of costs appear to be proper charges on their face, those items are prima facie evidence that the costs, expenses, and services are proper and necessarily incurred. [Citations.] The burden then shifts to the objecting party to show them to be unnecessary or unreasonable." (*Doe v. Los Angeles County Dept. of Children & Family Servs.* (2019) 37 Cal.App.5th 675, 693.) "[M]ere statements" in a motion to strike and attorney declaration "are insufficient to rebut the prima facie showing." (*Rappenecker v. Sea–Land Service, Inc.* (1979) 93 Cal.App.3d 256, 266.) The court found HSBC's claimed expert costs were facially proper, and thus prima facie evidence of necessity—meaning the

47

burden was on Rojas to show otherwise, and her motion to strike arguments were insufficient to do so.[23]

Second, Rojas does not establish the trial court abused its discretion by finding that, regardless of her burden, HSBC's evidence established its expert costs were reasonable and necessary. Under section 998, if a defendant's offer is "not accepted and the plaintiff fails to obtain a more favorable judgment," the court "may require the plaintiff to pay a reasonable sum to cover postoffer costs of the services of expert witnesses . . . actually incurred and reasonably necessary in either, or both, preparation for trial . . . , or during trial . . . , of the case by the defendant." (Code Civ. Proc., § 998, subd. (c)(1).)

Rojas disputes four expenses here: a "limousine" ride for $165; "[m]eals in the amount of $273.43"; 1.8 hours of "[a]dministrative" time entries totaling $675; and 72.8 hours of other time entries, totaling $27,150. We address each in turn.

---

[23] Thus, we reject Rojas's suggestion that her motion sufficed to place the burden on HSBC. (Cf. *Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 131 (*Nelson*) ["mere filing" of a motion to tax costs may be proper objection for items of doubtful necessity, but disagreeing "mere objection to charges which . . . appear to be proper" shifts burden].) *Jones v. Dumrichob* (1998) 63 Cal.App.4th 1258 and *Levy v. Toyota Motor Sales* (1992) 4 Cal.App.4th 807, cited by Rojas, do not show otherwise. (*Jones*, at pp. 1266–1268 [affirming expert costs, noting "absence of any information" from objecting party at hearing]; *Levy*, at pp. 810, 816–817 [affirming taxation of costs, where memorandum listed "other expenses authorized by statute and case law per declaration," declaration did not address them, and party did not substantiate them after objection; presuming the "court, in its sound discretion, found that the charges were excessive"].)

### a. *"Limousine" Ride*

With respect to the "limousine" charge for $165, Rojas argues "[n]othing indicates how use of a luxury '[l]imousine' as opposed to a regular car via Uber or Lyft was reasonably necessary . . . ." Transportation may be a necessary and reasonable expense. (See *Thon v. Thompson* (1994) 29 Cal.App.4th 1546, 1548–1549.) Rojas appears to assume "limousine" was a factual description of the vehicle (not just branding), and that it was more expensive than alternative forms of transport. But she identifies no evidence for these assumptions. (Compare *Thon*, at p. 1549 [where counsel conceded he took charter flight to save attorney fees for client, court erred by awarding more than commercial flight cost].) The trial court was within its discretion to find the cost reasonable.

### b. *Meals*

For the $273.43 in meal costs, Rojas argues the receipts do not show how many people participated or what was ordered, and that a 50 percent tip for one meal was excessive. It is not clear the 50 percent tip was even part of the claimed meal costs.[24] In any event, as the trial court recognized, HSBC's expert was from Georgia, and meal expenses for interstate travel may be recovered. (Cf. *Howard v. Am. Nat. Fire Ins. Co.* (2010) 187 Cal.App.4th at

---

[24] Although an expense report shows Geller-Stoff claimed $273.43 for meals, the receipts reflect three meals totaling $385.15 (for $45.13; $116.59; and $223.43, of which $75 is an approximately 50 percent tip). On the receipt for the $223.43 meal with the 50 percent tip, there is also a handwritten number, $111.71. That $111.71 number, when added to the other two meals ($45.23 and $116.59) totals the claimed amount of $273.43. Thus, the receipts suggest Geller-Stoff did not claim the entire $223.43 meal and may not have claimed some or all of the tip.

p. 541 ["meal expenses may be reasonably necessary where an out-of-state attorney must travel to the deposition"].)  Rojas does not establish the court exceeded the bounds of reason, based on her speculation about the meals generally or because one meal may have involved a generous tip.

### c.    *Administrative Work and Other Entries*

Finally, Rojas contends the entries for $675 of administrative work and other entries totaling $27,150 lacked sufficient detail.  For the latter, her only specific contention is that many entries state "Document Review," and there is no way to determine what documents were reviewed, whether the work was duplicative, or if the review time was excessive.  But section 998 allows expert costs "reasonably necessary in . . . preparation for trial," and both administrative work and document review may be necessary.  (§ 998, subd. (c)(1); see *Chaaban, supra*, 203 Cal.App.4th at p. 56 [affirming expert costs for "preparation time, trial testimony, and travel time"].)

Further, the trial court found HSBC's evidence was "sufficiently specific" to determine the reasonableness of the claimed costs.  Rojas does not establish any specific level of detail was required.  (See *Jones, supra*, 63 Cal.App.4th at p. 1267 [no requirement that "copies of bills, invoices, statements, or any other such documents be attached to the [costs] memorandum"]; *Thon, supra,* 29 Cal.App.4th at pp. 1548–1549 [disagreeing court erred by, inter alia, "awarding costs absent sufficient detail of the expenditures"; defendant supplied itemized costs and attorney declaration asserting necessity, and "absent an explicit statement by the trial court to the contrary, it is presumed the court properly exercised its legal duty"]; cf. *Syers Props. III, Inc. v. Rankin* (2014) 226 Cal.App.4th 691, 699 [attorney's fees; " 'Because time records are not required under California law . . ., there is no required level of detail that counsel must achieve' "].)

50

3.      *The Trial Court Did Not Abuse Its Discretion By Declining To Reduce Section 998 Costs Based On Rojas's Economic Situation*

Rojas also argues the trial court abused its discretion in setting the section 998 costs, by purportedly failing to consider undisputed facts regarding her limited economic means. The court did consider Rojas's situation, and reasonably found her evidence insufficient to limit costs.

In awarding costs under section 998, a court has "discretionary authority" to "consider[] . . . a party's ability to pay when determining the appropriate recovery under that statute." (*LAOSD Asbestos Cases* (2018) 25 Cal.App.5th 1116, 1127 (*LAOSD*); see *Santantonio v. Westinghouse Broadcasting Co.* (1994) 25 Cal.App.4th 102, 125, fn. 7 [§ 998 "permits the trial court, via exercise of discretion, to consider a party's ability to pay costs."]; cf. *Seever v. Copley Press, Inc.* (2006) 141 Cal.App.4th 1550, 1561 (*Seever*) [trial court "must take account of the offeree's economic resources," disapproved on other grounds in *Segal*, *supra*, 12 Cal.5th at p. 668, fn. 5].)

Here, the trial court recognized it had discretion to consider Rojas's economic situation and ability to pay, and did consider it. However, the court found it could not conclude she was "incapable of paying" the expert costs, explaining she provided "bare declaratory testimony as to her monthly income" and "no information regarding, inter alia, her monthly expenses or ability to obtain financial assistance from third parties." These findings were reasonable, as assessing economic circumstances requires information about both income and *expenses*. (See *LAOSD*, *supra*, 25 Cal.App.5th at p. 1127 [evidence of inability to pay includes " 'gross income, . . . net income, . . . *monthly expenses*, . . . assets, or any other information which . . . would lend support to [the party's] position,' " (italics added)].)

We are not persuaded by Rojas's contention that it was "undisputed" her " 'extremely low' " income "barely covers her necessary living expenses,

51

and that she has no other economic resources readily available to her." She did make these conclusory assertions about her expenses, in her declaration supporting her motion to strike or tax costs. However, the trial court was not required to accept them as credible—particularly when she *did* provide specific information about her income. Indeed, there was evidence at trial that Rojas lived with her boyfriend, her daughter Alejandra, and Alejandra's boyfriend, during the period relevant to her Privacy Act claims, reflecting potentially shared expenses at some point.

The trial court could fairly conclude Rojas did not justify a reduction in expert costs under section 998. Although we might not have reached this result, we cannot say the court's decision was outside the bounds of reason.

4. *The Trial Court Did Not Err in Awarding Unused Exhibit Costs*

Finally, Rojas contends the trial court erred by allowing costs for "models, enlargements, and photocopies of exhibits that were not admitted at trial . . . ." We disagree.

Code of Civil Procedure section 1033.5, subdivision (a)(13) states, "Models, the enlargements of exhibits and photocopies of exhibits, and the electronic presentation of exhibits, including costs of rental equipment and electronic formatting, may be allowed if they were reasonably helpful to aid the trier of fact." As noted above, another subdivision, (c)(4), "authorizes the trial court in its discretion to award or deny an item of costs not mentioned in this section." (*Segal, supra,* 12 Cal.5th at p. 658.)

At the time of the cost proceedings below and briefing here, there was a "split of appellate authority regarding whether costs associated with unused demonstratives and photocopies of trial exhibits are recoverable, either categorically under section 1033.5(a)(13) or in the court's discretion pursuant to section 1033.5(c)(4)." (*Segal, supra,* 12 Cal.5th at p. 658; compare, e.g.,

52

*Segal v. Asics America Corp.* (2020) 50 Cal.App.5th 659, 665 [costs for unused exhibits may be awarded under Code Civ. Proc., §§ 1033.5(a)(13), and under (c)(4) "[f]or the same reasons"]; with, e.g., *Seever, supra,* 141 Cal.App.4th at pp. 1557–1561 [costs not recoverable under either section].) The California Supreme Court subsequently resolved the split in *Segal,* affirming the Court of Appeal's disposition and holding, "[C]osts related to unused photocopies of trial exhibits and demonstratives are not categorically recoverable under section 1033.5(a)(13), but they may still be awarded in the trial court's discretion pursuant to section 1033.5(c)(4)." (*Segal,* at p. 657.) As noted, we requested supplemental briefing from the parties regarding the impact of *Segal* on this appeal, which they provided.

First, under the California Supreme Court's decision in *Segal*, the trial court did not err by awarding costs for unused trial exhibits. (*Segal, supra,* 12 Cal.5th at p. 657.) Although the court erroneously determined the costs were allowable under Code of Civil Procedure section 1033.5(a)(13), as Rojas notes in her supplemental brief, it still found they were "necessary" and "reasonable," the relevant considerations for the overarching cost standards that apply regardless of the authorizing subsection. (*Segal*, at p. 667 ["It bears repeating that any award of costs . . . must meet the requirements of subdivision (c)(2) and (c)(3)"].) On this record, we can conclude that had the court known subdivision (a)(13) was unavailable, it would have exercised its discretion under section (c)(4) to award the costs. (See *State ex rel. Rapier v. Encino Hospital Medical Center* (2022) 87 Cal.App.5th 811, 839–841 [affirming costs, where trial court "exercised its discretion under subdivision (a)(13) in determining that unused exhibits were reasonably helpful"; "Although that award was ultimately mis-categorized, the same discretion

53

exercised under subdivision (a)(13) supported awarding the costs under subdivision (c)(4)."].)

Second, Rojas does not establish the trial court abused its discretion in evaluating the unused exhibit costs. She argued in her opening brief that the "court failed to consider or analyze" whether these costs "were reasonably helpful to the trier of fact," but rather, "blanketly concluded that the costs were reasonable and necessary, and reasonably helpful to aiding the trier of fact." The court was in the best position to draw these conclusions, including the necessity and reasonableness determinations pertinent to Code of Civil Procedure section 1033.5, subd. (c)(4), and we presume it considered all relevant matters in doing so. (*Rozanova v. Uribe* (2021) 68 Cal.App.5th 392, 405 [trial court is in "best position to evaluate" if exhibits were, inter alia, " 'reasonably necessary to the conduct of the litigation' . . . and [their costs] 'reasonable in amount' "]; see Evid. Code, § 664.) We note numerous exhibits related to the call recordings—which both parties utilized at trial, and which Rojas tried unsuccessfully to admit as a set and maintains in the appeal from judgment should all have been admitted (a contention we do not reach, having concluded the court's consent finding supports affirmance). (Cf. *Segal*, *supra*, 12 Cal.5th at p. 667 [disagreeing costs for unused exhibits would necessarily incentivize over-preparation]; *id.* at pp. 667–668 [disagreeing it was illogical to require party to pay for costs it excluded from trial; "The Legislature could have spelled out a categorical prohibition against shifting costs for inadmissible exhibits, but did not."].)

In her supplemental brief, Rojas argues the trial court improperly failed to place the burden of proof for "costs . . . not expressly authorized by statute" on HSBC. Even if this were error, it would be harmless. HSBC provided evidence for the exhibit costs, the court could conclude the evidence

supported the necessity and reasonableness of the claimed costs, and, again, the court was in the best position to make that assessment. (Cf. *Nelson*, *supra*, 72 Cal.App.4th at p. 111 [addressing exhibit costs; "[b]urden of proof is not an issue in this instance, since, having presided over the trial, the trial court had all the evidence needed to determine whether the items claimed were reasonably helpful to the trier of fact."].)[25]

In sum, Rojas does not establish the trial court erred by denying her motion to strike or tax HSBC's costs.

---

[25] Rojas's authority for this argument, *Gorman v. Tassajara Dev. Corp.* (2009) 178 Cal.App.4th 44, cites *Nelson* to state that "where costs are not expressly allowed by the statute," the "burden is on the party claiming" them. (*Id.* at p. 71, citing *Nelson*, *supra*, 72 Cal.App.4th at p. 132.) Actually, consistent with its comments on burden shifting, noted above, *Nelson* said the claiming party was "required to prove the reasonableness and necessity of items only if not properly claimed . . . ." (*Id.* at p. 130, emphasis omitted; see *id.* at p. 131 ["The court's first determination . . . is whether the statute expressly allows the particular item, and whether it appears proper on its face. [Citation] If so, the burden is on the objecting party"]; *id.* at 132 ["Messenger fees are not expressly authorized by statute, but may be allowed in the discretion of the court. [Citations.] The trial court *found the messenger filings to be of doubtful necessity and unreasonabl*e *on their face* . . . . The burden was therefore properly placed upon [the claiming party]," emphasis added].)

DISPOSITION

The judgment and postjudgment order are affirmed. HSBC shall recover its costs on appeal.

IRION, J.

I CONCUR:


HUFFMAN, Acting P. J.

56

Dato, J., Concurring and Dissenting.

The two operative privacy statutes – Penal Code sections 632 and 632.7 [1] – each prohibit the *intentional* recording of certain phone conversations *without consent* of all parties. Like the majority, I agree there is no substantial evidence to support the trial court's conclusion that HSBC did not intend to record hundreds of personal phone calls to plaintiff Dalia Rojas from her daughter, an employee of an HSBC call center in Salinas, California. Unlike my colleagues, however, I do not believe we can affirm the judgment on the basis that Rojas impliedly consented to HSBC's recording of the calls. Accordingly, I must respectfully dissent.

A

In the context of this case, the concept of "implied" consent requires that the consenting party, *knowing that the phone calls will be recorded*, take action (typically, continuing with the phone call) that impliedly indicates agreement to permit the recording. Here, applying a deferential "substantial evidence" standard of review, the majority opinion affirms the trial court's purported factual finding that Rojas impliedly consented. But it's not nearly that simple.

First and foremost, the trial court never determined that Rojas *knew* the calls were being recorded. (See *Griggs-Ryan v. Smith* (1st Cir. 1990) 904 F.2d 112, 117 [plaintiff must have " 'knowingly agreed to the surveillance' "].) Rather, it concluded that she was on "inquiry notice" and "should" or "would" have been aware of the recordings. But this is the wrong legal standard. (*Id.* at p. 116 ["implied consent is not constructive consent"].) It is not enough that Rojas objectively *should have* known the calls were being recorded, much

_____

[1]     All statutory references are to the Penal Code.

less that an inquiry (which she did not conduct) would have led her to that conclusion. Instead, the question is subjective–did Rojas agree to having the calls recorded? If she was told the call would be recorded and did not thereafter "decline to continue the communication" (*Kearney v. Salomon Smith Barney, Inc.* (2006) 39 Cal.4th 95, 118 (*Kearney*)), there would be a sufficient basis to conclude she impliedly consented to the recording. But proceeding with a phone call cannot imply consent if Rojas wasn't aware it was being recorded. Any asserted neglect on her part in not asking if the calls were recorded cannot create consent. By applying the wrong standard, the trial court committed legal error, and its resulting conclusion cannot be reviewed for substantial evidence.

The majority opinion suggests that any legal error in misstating the legal standard was harmless "because substantial evidence still supports the court's consent findings." (Maj. opn., *ante*, at p. 33.) But this misapplies the standard for prejudice. The question is not whether there is enough evidence to support a finding of implied consent, but instead whether Rojas can show a reasonable probability of a more favorable result had the court applied the correct standard. (*Strouse v. Webcor Construction, L.P.* (2019) 34 Cal.App.5th 703, 718.) As the Supreme Court has emphasized, " 'probability' in this context does not mean more likely than not, but merely a *reasonable* chance, more than an *abstract possibility*." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.)

The trial court's brief discussion of consent in its statement of decision gives no indication that it found Rojas was *actually aware* the calls were being recorded. Indeed, had it made that finding, there would have been no need to mention the inapplicable concepts of "inquiry notice" and whether Rojas "should have been aware" of the recordings. Given the nature of the

2

evidence HSBC relied on to show Rojas's knowledge that the calls were being recorded (see *post*, part B), there is far more than a "reasonable chance" of a different result. There is, in fact, compelling evidence that Rojas did *not* consent.

B

As the Supreme Court observed in *Kearney,* "California consumers are accustomed to being informed at the outset of a telephone call whenever a business entity intends to record the call." (39 Cal.4th at p. 118, fn. 10.) At that point, the consumers "simply may decline to continue the communication" if they do not want to be recorded. (*Id.* at p. 118.) On the other hand, if they proceed with the call it is reasonable to infer they impliedly consented to the recording.

In this case, there is no dispute that HSBC did *not* inform Rojas "at the outset" of any call with her daughter that anything was going to be recorded. Instead, HSBC and the trial court relied on two advisements that Rojas received in an entirely different context, unrelated to any phone call with her daughter. She received both, fortuitously, because she happened to be an HSBC credit card customer; neither had anything to do with her daughter's employment at an HSBC call center. In my view, neither supports a finding of implied consent.

The first of these advisements is contained in a prolix 14-page "Cardmember Agreement" sent to Rojas because she applied for a credit card. Included under a heading "Monitoring Practices," sandwiched between "Account Closure" and "Change of Terms," the cardmember is told, "You agree that we may listen to and record phone calls between you and our representatives." Elsewhere in the agreement there are two references to phone calls. The cardmember can "call[ ] the number on the back of your

3

card" to close the account. Or if the card is lost or stolen, the cardmember is invited to call "[t]he phone number . . . listed on your billing statement." Both of these references are to calls placed *by* the cardmember *to* HSBC about the credit card account. Nowhere does the agreement remotely suggest that if the cardmember receives a personal call *from* a friend or relative who happens to be employed by HSBC, *that* call will be recorded.[2]

The second advisement relied on by HSBC and the trial court was the automated one Rojas said she heard when she called the number on the back of her credit card to make a monthly payment and was told, " 'This call may be recorded.' " The fact that *this* call may be monitored, or even this *kind* of

---

[2]     The cardmember agreement is a written contract, the meaning of which presents a question of law unless the foundational extrinsic facts are in conflict. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865; *Medical Operations Management, Inc. v. National Health Laboratories, Inc.* (1986) 176 Cal.App.3d 886, 891.) Here, the foundational facts are undisputed, and the language of the agreement is at best ambiguous as to whether "phone calls between you and our representatives" includes personal calls made to Rojas by her daughter, who was not calling in her capacity as an HSBC representative. In deciding what the advisement means, our job is to determine the most reasonable interpretation of the parties' agreement in light of the undisputed evidence. (See *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955; *Millsap v. Spilman* (1969) 270 Cal.App.2d 444, 446; *Aozora Bank, Ltd. v. 1333 North California Boulevard* (2004) 119 Cal.App.4th 1291, 1295–1296.) The question is how HSBC believed a reasonable cardholder would have understood the statement, interpreting any ambiguities against the drafter of the contract, HSBC. (Civ. Code, §§ 1649, 1654.) Clearly, the most (if not only) reasonable interpretation of the cardholder agreement is that it pertains to the recording of phone calls *regarding the credit card account.* Even the key authority cited in the majority opinion suggests as much. (*Maghen v. Quicken Loans Inc.* (C.D.Cal. 2015) 94 F.Supp.3d 1141, 1143, 1145−1146 [plaintiff's agreement to Terms of Use on mortgage refinance application, that referred to calls on a "recorded line," implied her consent to being recorded when a loan officer called *about her application*], affd. 680 Fed.Appx. 554, 555.)

4

call—i.e., one by the cardmember to HSBC to make a payment—does not give notice that an entirely different and unrelated kind of call—a personal one by an HSBC employee to her mother—will likewise be recorded.

Equally significant, HSBC was forced to rely on these inapplicable and inadequate advisements because it consciously chose *not* to provide actual notice to call participants. Questioned about the automated advisements that greeted the caller on every incoming call *to* the call center, HSBC representatives conceded it was similarly feasible to include an automated advisement on outgoing calls made *from* the call center, but that the company declined to do so for business reasons because such an advisement would "significantly decrease[ ] the chance that the call will be answered." In other words, HSBC believed that if customers really *knew* the call was being recorded, many would not consent to participate. And it was better from HSBC's business perspective to keep them in the dark and address any resulting privacy issues at a later time, if and when they arose.

C

Applying the proper legal standard, Dalia Rojas did not knowingly consent to HSBC recording personal phone calls that her daughter—an HSBC employee—made to her from work. She was never advised at the outset of any call that it would be recorded, as California consumers are accustomed to. (*Kearney, supra,* 39 Cal.4th at p. 118, fn. 10.) Neither of the two totally unrelated advisements pointed to by HSBC and relied on by the trial court gave Rojas any notice that calls from her daughter were being recorded, such that she could then decide whether she wanted to discontinue the call.

Because HSBC intentionally recorded Rojas's phone calls without her consent, in violation of sections 632 and 632.7, the judgment should be reversed.

DATO, J.

6